**SCOTT E. BRADFORD, OSB #062824**
United States Attorney
District of Oregon
**MICHAEL J. JETER, OSB #165413**
Assistant United States Attorney
michael.jeter@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2936
Telephone: (503) 727-1000
        *Attorneys for Defendant United States*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **RICHARD STRATTON,** | **Case No. 3:23-cv-01894-MO** |
| Plaintiff, | |
| v. | **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT** |
| **ANDREW GRASLEY; NELSON AYALA-RUBIO, and UNITED STATES OF AMERICA,** | |
| Defendants. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................iii

LOCAL RULE 7-1 CERTIFICATE ................................................................................ 1

MOTION ........................................................................................................................ 1

MEMORANDUM .......................................................................................................... 1

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 4

    I.    Pre-Incarceration Medical Treatment ...................................................... 4

    II.    BOP Treatment During Incarceration ...................................................... 6

        A.  Arrival at FCI Sheridan .................................................................... 6

        B.  First Appointment with Dr. Grasley ................................................ 6

        C.  Second Appointment with Dr. Grasley ............................................ 7

        D.  First Appointment with Outside Oncology Provider ...................... 8

        E.  First Appointment with Dr. Ayala-Rubio .................................... 10

        F.  Second Appointment with Dr. Ayala-Rubio ................................ 12

        G.  Second Appointment with Outside Oncology Provider ................ 12

    III.    Medical Treatment after Release ........................................................... 13

        A.  From October 2022 through June 2023, Plaintiff Refused to Engage in Cancer Treatment ...................................................................... 13

        B.  On June 15, 2023, Plaintiff Reengaged with His Oncologist for the First Time Since October 2022 ......................................................... 15

LEGAL STANDARD ................................................................................................... 16

ARGUMENT ................................................................................................................ 17

Page i –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

IV.     BOP Medical Providers Exceeded the Standard of Care and There is No Evidence of Causation ................................................................................ 17

       A. *Plaintiff Did Not Produce Expert Testimony Required to Establish the Standard of Care for Primary Care Physicians and the BOP Doctors Met or Exceeded the Applicable Standard of Care* ................................ 18

           i.     *Plaintiff Did Not Provide Expert Testimony Establishing the Applicable Standard of Care* ......................................................... 19

           ii.     *Drs. Grasley and Ayala-Rubio Met or Exceeded the Standard of Care for Primary Care Physicians* .............................................. 22

       B. *Plaintiff Cannot Establish Causation* .................................................... 24

V.     BOP Officers Applied the Appropriate Amount of Force in Response to Plaintiff's Display of Imminent Violence and Active Resistance ............... 29

       A. *Use of Force Incident* ............................................................................ 30

       B. *BOP Officers' Use of Force was Objectively Reasonable* ........................ 32

VI.     Plaintiff's Rehabilitation Act Claim is Without Merit ............................... 37

CONCLUSION .............................................................................................................. 40

WORD COUNT CERTIFICATE .................................................................................. 41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acri v. Varian Assocs., Inc.,*
114 F.3d 999 (9th Cir. 1997) ........................................................................ 34

*Arpin v. Santa Clara Valley Transp. Agency,*
261 F.3d 912 (9th Cir. 2001) ........................................................................ 33

*Ballard v. City of Albany,*
221 Or. App. 630 (2008) ........................................................................ 32, 33

*Baughman v. Pina,*
200 Or. App. 15 (2005) ........................................................................ passim

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................ 17

*Chapman v. Mayfield,*
358 Or. 196 (2015) ........................................................................ 25

*Chouinard v. Health Ventures,*
179 Or. App. 507 (2002) ........................................................................ 25

*Curtis v. MRI Imaging Servs. II,*
956 P.2d 960 (1988) ........................................................................ 19

*Duvall v. Cnty. of Kitsap,*
260 F.3d 1124 (9th Cir. 2001) ........................................................................ 38

*Edison v. United States,*
822 F.3d 510 (9th Cir. 2016) ........................................................................ passim

*Forrester v. City of San Diego,*
25 F.3d 804 (9th Cir. 1994) ........................................................................ 33

*Getchell v. Mansfield,*
489 P.2d 953 (1971) ........................................................................ passim

*Gigler v. City of Klamath Falls,*
21 Or. App. 753 (1975) ........................................................................ 32

*Graham v. Connor,*
490 U.S. 386 (1989) ........................................................................ 33, 34, 36

*Jones v. North Carolina Prisoners' Lab. Union, Inc.,*
433 U.S. 119 (1977) ........................................................................ 37

*Joshi v. Providence Health Sys. of Oregon Corp.,*
342 Or. 152 (2006) ........................................................................ 24, 25

*Kristiansen v. United States,*
No. 3:24-CV-01719-IM, 2025 WL 2049290 (D. Or. July 22, 2025) ................... 32, 33

*Lemos v. Cnty. of Sonoma,*
40 F.4th 1002 (9th Cir. 2022) ........................................................................ 34, 35, 36

*Nelson v. Pima Cmty. Coll.,*
83 F.3d 1075 (9th Cir. 1996) ........................................................................ 17

Page iii –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

*O'Guinn v. Lovelock Corr. Ctr.*,
   502 F.3d 1056 (9th Cir. 2007) ........................................................ 37, 38
*Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*,
   336 Or. 329 (2004) ................................................................................... 25
*Porter v. Nussle*,
   534 U.S. 516 (2002) ................................................................................. 38
*Price v. City of Sutherlin*,
   945 F. Supp. 2d 1147 (D. Or. 2013) ................................................. 33, 36
*Reddye v. City of Astoria*,
   No. 3:22-CV-01569-AR, 2025 WL 1160044 (D. Or. Mar. 31, 2025) ....... 34
*Reynolds v. Cnty. of San Diego*,
   84 F.3d 1162 (9th Cir. 1996) ................................................................. 33
*Romero v. Cnty. of Santa Clara*,
   No. 11-CV-04812-WHO, 2014 WL 3378628 (N.D. Cal. July 10, 2014) ..... 38
*Sheppard v. Firth*,
   215 Or. 268, 334 P.2d 190 (1959)........................................................... 19
*Sims v. Dixon*,
   224 Or. 45 (1960) .................................................................................... 25
*Smith v. City of Hemet*,
   394 F.3d 689 (9th Cir. 2005) ................................................................. 34
*Smith v. Providence*,
   361 Or. 456 (2017) ....................................................................... 29, 30, 32
*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
   809 F.2d 626 (9th Cir. 1987) ................................................................. 17
*Thornburgh v. Abbott*,
   490 U.S. 401 (1989) ................................................................................. 37
*Trees v. Ordonez*,
   311 P.3d 848 (2013) ................................................................................ 19
*Walthers v. Gossett*,
   148 Or. App. 548 (1997) ......................................................................... 32
*Wemmett v. Mount*,
   134 Or. 305 (1930) .................................................................................. 19
*Zehr v. Haugen*,
   871 P.2d 1006 (1994) .............................................................................. 18

**Statutes**

28 U.S.C. § 2402........................................................................................ passim
28 U.S.C. § 2671............................................................................................... 9
O.R.S. § 161.233............................................................................................. 32

**Rules**

Fed. R. Civ. P. 56 ............................................................................................ 1
Fed. R. Civ. P. 56(a)....................................................................................... 16

Page iv –     **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

## LOCAL RULE 7-1 CERTIFICATE

Undersigned counsel certifies that he made a good faith effort to resolve the dispute with Plaintiff's counsel. The parties were unable to resolve the issues raised in this motion.

## MOTION

Defendant, United States of America, ("United States") moves for summary judgment on all claims against it under Fed. R. Civ. P. 56. This motion is based on the following memorandum and accompanying declarations.

## MEMORANDUM

## INTRODUCTION

The Federal Bureau of Prisons' ("BOP") doctors provided Richard Stratton ("Plaintiff") with excellent treatment that exceeded the medical standard of care during his nine-month incarceration at Federal Correctional Institution ("FCI") Sheridan. Plaintiff arrived at FCI Sheridan with no medical documentation of his multiple myeloma, and he had not informed his oncologist of his incarceration. As soon as BOP Medical Director Dr. Andrew Grasley learned of Plaintiff's condition, he promptly referred Plaintiff to an outside oncologist. Likewise, when Dr. Nelson Ayala-Rubio—the only other doctor employed at FCI Sheridan—met with Plaintiff, he quickly prescribed Plaintiff with a comprehensive regimen of pain medications.

BOP medical treatment did not cause Plaintiff's multiple myeloma to worsen. The outside oncoligst determined that Plaintiff did not require ongoing chemotherapy medications and recommended that herestart his treatment upon his

Page 1 –   **DEFENDANT UNITED STATES' MOTION FOR SUMMARY
            JUDGMENT**

return to Montana. BOP doctors were bound to follow the oncology specialists' recommendations. Laboratory results showed that Plaintiff's multiple myeloma remained in remission during his entire incarceration and the absence of chemotherapy medications during that period had no negative effect on his condition.

Upon release, Plaintiff engaged in a pattern of drug-seeking behavior and actively avoided cancer treatment. Medical records establish that Plaintiff repeatedly sought overlapping prescriptions for powerful pain medications such as oxycodone despite well-documented admonitions from several treatment providers. When Plaintiff returned to his oncologist for the first time within a month of his release from prison, instead of restarting cancer treatment, he walked out of the clinic when his demand for oxycodone was not immediately granted. Plaintiff did not re-engage in cancer treatment for eight months after his release, at which point the first evidence that his multiple myeloma came out of remission emerged. There can be no genuine factual dispute that the doctors met the standard of care and did not cause Plaintiff harm.

Moreover, the United States is entitled to summary judgment on Plaintiff's battery claim. BOP officers placed Plaintiff on the ground outside his cell in the special housing unit ("SHU") after he refused multiple orders and made an aggressive move toward an officer. Because Plaintiff had a medical front handcuff pass, he posed a heightened safety risk to officers. The entire incident took moments

Page 2 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

and was video recorded from two angles.[1] Officers secured his appendages, applied leg restraints, and escorted him for medical evaluation. There is no evidence to corroborate Plaintiff's incredible claims that officers struck him and dropped knees on him while he was being held prone facing the floor. The video-recorded medical evaluation showed no evidence of injury requiring medical treatment.[2] BOP officers followed use-of-force policies and used only the amount of force that was necessary to gain control of the inmate and maintain safety.

Finally, Plaintiff's Rehabilitation Act claim that he was denied crutches is without merit. First, Plaintiff never filed an administrative grievance with the BOP requesting crutches. That failure to exhaust alone would preclude his claim had he brought it while he was incarcerated, and it should be dispositive of his claim here. Second, Plaintiff testified that he never verbally requested crutches from BOP staff. Third, BOP staff gave him express medical authorization to obtain crutches if he wished—Plaintiff simply never did so.

For these reasons, summary judgment should be granted on all Plaintiff's claims against the United States. If Plaintiff's medical malpractice or battery claim brought under the Federal Tort Claims Act ("FTCA") survive summary judgment, those claims would be decided at a bench trial before this Court. *See* 28 U.S.C. § 2402.

///

---

[1] Declaration of Michael Jeter ("Jeter Decl") Ex. 18, 20.
[2] Jeter Decl. Ex. 19.

Page 3 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

## BACKGROUND

### I.    Pre-Incarceration Medical Treatment

In May 2021, Plaintiff was hospitalized in Missoula, Montana, after presenting with hip pain. Jeter Decl. Ex. 1 at 14-19, 22. Medical imaging and a biopsy showed initial evidence of multiple myeloma that was diagnosed in early June 2021. Jeter Decl. Ex. 1 at 20, 22. Multiple myeloma is a cancer of the blood cells that ultimately causes, *inter alia*, painful bone lesions and fractures. Jeter Decl. Ex. 11, Report of Dr. Andrew Rezvani[3] ("Dr. Rezvani Rep."), at 2; Ex. 13, Report of Dr. David Ruiz[4] ("Dr. Ruiz Rep."), at 2. It is generally thought incurable, but highly effective treatments exist that can temporarily suppress the myeloma cells and cause a remission. *See* Dr. Rezvani Rep. at 2. The goal of myeloma treatment is to keep the disease in remission to the extent possible. *Id.* "The initial phase of treatment is called *induction* and typically entails a combination of chemotherapy drugs given in cycles over several months." *Id.* "Once induction is completed and the myeloma enters a remission, patients may transition to *maintenance*, in which low doses of chemotherapy are given to keep a myeloma in remission for as long as possible." *Id.* at 3.

When Plaintiff was diagnosed with multiple myeloma, his primary care provider was Dr. Allen Jones and for cancer treatment Plaintiff was referred to Dr. John Linford, an oncologist of Community Medical Center, Montana Cancer

---

[3] *See* Jeter Decl. Ex. 11 at 31.
[4] *See* Jeter Decl. Ex. 13 at 12.

Page 4 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

Specialists. Jeter Decl. Ex. 1 at 18, 21. In June 2021, Dr. Linford initiated induction chemotherapy. Jeter Decl. Ex. 1 at 4, 7; Dr. Rezvani Rep. 4. Plaintiff was prescribed gabapentin, morphine tablets, and oxycodone for pain. Jeter Decl. Ex. 1 at 12. At discharge he was instructed to take pain medications as needed and warned of opioid addiction. *Id.* at 13.

After discharge Plaintiff immediately began seeking multiple overlapping pain medication prescriptions and would not give providers a "straight answer" when confronted about running out of 180 pills of oxycodone in 13 days. Jeter Decl. Ex. 1 at 1-3, 5-6; Ex. 3 Deposition of Richard Stratton ("Stratton Dep.") 43:19–24. Plaintiff repeatedly visited the emergency department, demanded oxycodone, became angry with providers, and refused a referral for advanced pain treatment. Jeter Decl. Ex. 1, 8-11, 42-45. Plaintiff understood he was under a pain contract with his doctor stating no early prescription refills. *Id.* at 23-25, 43-45. By September 2021, Plaintiff's drug seeking persisted such that the doctor wrote that he "will NOT be refilling" Plaintiff's pain medication other than every 4 weeks and the pharmacy was contacted to ensure Plaintiff would not obtain additional morphine and oxycodone. Jeter Decl. Ex. 1 at 26, 28-29, 31-36.

On November 3, 2021, laboratory results obtained by Dr. Linford indicated that Plaintiff's multiple myeloma had entered remission. Jeter Decl. Ex. 1 at 37; Dr. Rezvani Rep. 4. Dr. Linford informed Plaintiff of this and that his treatment would transition from the more intense induction to maintenance chemotherapy. Jeter Decl. Ex. 1 at 27, 38; Dr. Rezvani Rep. 4.

Page 5 –     **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

## II.    BOP Treatment During Incarceration

### A. *Arrival at FCI Sheridan*

From August through December 2021—after his multiple myeloma diagnosis—Plaintiff violated several conditions of his supervised release including aggravated DUI, trespass, and obstruction for attempting to put an officer in a headlock. Jeter Decl. Ex. 1 at 169. As a result of Plaintiff's conduct, on January 7, 2022, he began his nine-month term of imprisonment for violating the conditions of his probation.

When Plaintiff was taken into BOP custody, he did not inform his oncologist Dr. Linford of his incarceration, nor did he bring any medical record of his myeloma treatment to FCI Sheridan. Jeter Decl. Ex. 1 at 133-139, Stratton Dep. 62:24–63:8. He arrived with prescriptions for acetaminophen, ibuprofen, and hydroxyzine (for sleep). Jeter Decl. Ex. 1 at 132, 137; Dr. Ruiz Rep. 2–3.

### B.    *First Appointment with Dr. Grasley*

On January 9, 2022, Plaintiff requested to be seen about his multiple myeloma. Jeter Decl. Ex. 1 at 157. BOP staff responded that Plaintiff would have a medical appointment after completion of COVID testing and quarantine. *Id.* On February 3, 2022, Plaintiff tested positive for COVID and was placed in isolation. Jeter Decl. Ex. 1 at 182.

On February 15, 2022, Plaintiff had his initial medical evaluation with Dr. Grasley. Jeter Decl. Ex. 1 at 128-131; Declaration of Andrew Grasley ("Grasley Decl.") ¶ 6. At that appointment, Dr. Grasley solicited Plaintiff's description of his

Page 6 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

medical history and current condition. Jeter Decl. Ex. 1, 128-131; Ex. 8 at 1; Grasley Decl. ¶ 6. In response to Plaintiff's lower-back pain complaints, Dr. Grasley immediately prescribed oxcarbazepine and stronger ibuprofen. Jeter Decl. Ex. 8 at 2; Jeter Decl. Ex. 1 at 129. That same day, Dr. Grasley requested an oncology consultation with a target date of April 16, 2022. Jeter Decl. Ex. 1 at 130, 155. Dr. Grasley took the extra step of expediting this consult request by emailing BOP staff that Plaintiff "Needs eval by oncologist ASAP." Jeter Decl. Ex. 1, 175-177. He ordered labs be drawn with the same expediency. Jeter Decl. Ex 1, 178-180. Finally, Dr. Grasley had Plaintiff fill out an authorization for release of medical records from Dr. Linford. Jeter Decl. Ex. 1 at 156.

## C.   *Second Appointment with Dr. Grasley*

On March 2, 2022, Dr. Grasley met with Plaintiff again. Plaintiff told Dr. Grasley he did not want to take oxcarbazepine and wanted gabapentin instead. Jeter Decl. Ex. 1 at 126-127, 170-172; Grasley Decl. ¶ 7. Dr. Grasley explained that the two medications work the same way. Jeter Decl. Ex. 1 126-127, 170-172; Grasley Decl. ¶ 7. Gabapentin was a nonformulary medication, meaning that it was not on BOP's National Formulary and required that multiple prerequisite medications be tried before obtaining nonformulary approval for gabapentin. *See* Dr. Ruiz Rep. 3; Jeter Decl. Ex. 1, 127, 190-193; Grasley Decl. ¶ 7. Despite the explanation, Plaintiff refused the oxcarbazepine. Jeter Decl. Ex. 1 at 126-127. Dr. Grasley offered Plaintiff another gabapentin alternative, amitriptyline, that Plaintiff also refused. Jeter Decl. Ex. 1, 126-127, 170-172 ("He does not want any of the pain medication that I

Page 7 –   **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

have offered him."); Grasley Decl. ¶ 7. Dr. Grasley also discussed Plaintiff's upcoming oncology appointment with him.[5] Jeter Decl. Ex. 1 at 126-127. On that same date, labs ordered by Dr. Grasley were drawn. Jeter Decl. Ex. 1 at 143; Dr. Rezvani Rep. 4.

**D.     *First Appointment with Outside Oncology Provider***

On March 4, 2022, Plaintiff was transported to Oregon Oncology Specialists, more than a month earlier than the appointment's April 16 target date and only about two and a half weeks after his initial evaluation with Dr. Grasley. Jeter Decl. Ex. 1 at 152-153. Plaintiff was seen by Dr. Catherine O'Brien, an oncologist in private practice outside the BOP system. *Id.* She noted, "I have no records referable to the patient's prior diagnosis of multiple myeloma. I obtained the entire history from the patient himself." *Id.*; *see also* Stratton Dep. 82:6–15. Dr. O'Brien surmised that Plaintiff might have received chemotherapy treatment for approximately seven months but that "[i]t is unknown if how his labs responded to that." Jeter Decl. Ex. 1 at 152-153. She drew labs indicating that Plaintiff's multiple myeloma remained in remission. *Id.*; Dr. Rezvani Rep. 4–5.

She wrote that she wanted Plaintiff's prior records from Montana and that he planned to return there after release. *Id.* She wrote: "We may want to treat him with an all oral regimen if we can get this accomplished with him at the current facility. This would involve dexamethasone, Revlimid, Ninlaro. I will wait until we

---

[5] Specific appointment dates at facilities outside the prison are not to be discussed in front of inmates for security purposes. *See* Jeter Decl. Ex. 1 at 202; Grasley Decl. ¶ 7.

Page 8 –     **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

get his updated labs from here and then I will reach out to his medical provider, Dr. Grasley, at the Sheridan facility to see what is possible." *Id.* She also noted: "Optimally he needs to be on *continuous* treatment. I need to see labs before recommending [treatment]. Likely I can [treat] him with an all-oral regimen at FCI." Jeter Decl. Ex. 1 at 154. Dr. O'Brien did contact Dr. Grasley about starting chemotherapy. *See* Rezvani Rep. 5; Stratton Dep. 82:24–83:22; Ex. 4 Deposition Transcript of Dr. Andrew Grasley ("Grasley Dep.") 14:16–15:11; Grasley Decl. ¶ 8. She did not recommend any chemotherapy maintenance treatment but she did recommend "gabapentin 300 mg twice daily and MS Contin 15 mg twice daily." Jeter Decl. Ex. 1, 153.[6]

Upon Plaintiff's return to FCI Sheridan, Plaintiff was met by Paramedic Karl Bergman who evaluated him. Jeter Decl. Ex. 1 at 124-125, 142. Mr. Bergman gave Plaintiff medical authorization to obtain crutches. *Id.* Mr. Bergman's practice with such authorizations was to give the receiving inmate multiple copies to show to various BOP staff to obtain the crutches. Declaration of Karl Bergman ¶ 6–7; Jeter Decl. Ex. 6 Deposition Transcript of Karl Bergman ("Bergman Dep.") 8:8–24. Plaintiff never requested crutches from BOP staff. Stratton Dep. 86:23–87:7.

---

[6] Notably, scheduling of inmate appointments with outside medical providers is handled by an independent contractor, Integrated Medical Solutions. *See* Jeter Decl. Ex. 1, 201-202; Grasley Decl. ¶ 9. Additionally, Oregon Oncology Specialists were also independent contractors in private practice. Neither entity is a party to this lawsuit. To the extent Plaintiff's negligence claim encompasses the scheduling of his oncology appointments or the oncologist's act or omissions, those matters cannot be attributed to the United States. *See* 28 U.S.C. § 2671; *Edison v. United States*, 822 F.3d 510, 514 (9th Cir. 2016).

Page 9 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

On March 11 and 27, 2022, Dr. Grasley sent himself reminders to check on the status of the oncology consult. Jeter Decl. Ex. 1, 174, 181; Grasley Decl. ¶ 9. On March 28, 2022, Plaintiff received a copy of Dr. O'Brien's consultation notes, and he reported to nursing staff complaining of chest pain. Jeter Decl. Ex. 1, 122, 151. Nurse Jennifer Pond evaluated Plaintiff for chest pain, and found no concerning clinical indications and believed Plaintiff was malingering. Jeter Decl. Ex. 1, 123; Ex. 7 Deposition Transcript of Jennifer Pond ("Pond Dep.") 10:1–23, 12:4–14:6. Nurse Pond relayed Plaintiff's complaints to Dr. Grasley who—within three hours— submitted a second request for an oncology consultation with a target date of May 12, 2022. Jeter Decl. Ex. 1 at 121.

**E.**      ***First Appointment with Dr. Ayala-Rubio***

On March 30, 2022, BOP staff relayed Plaintiff's request to be seen by medical providers again to Dr. Ayala-Rubio. Jeter Decl. Ex. 1, 173. The next day Dr. Ayala-Rubio met with Plaintiff. Jeter Decl. Ex. 1, 113-120; *see also* Dr. Ruiz Rep. 5. Dr. Ayala-Rubio obtained Plaintiff's description of his medical history and condition. *Id.*; Declaration of Nelson Ayala-Rubio ("Ayala-Rubio Decl.") ¶ 6. Upon reviewing Dr. O'Brien's recommendations, Dr. Ayala-Rubio immediately prescribed morphine. Jeter Decl. Ex. 1 at 114; Ayala-Rubio Decl. ¶ 6. Plaintiff's first dose of morphine was

Page 10 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

administered later that day. Jeter Decl. Ex. 1 at 140[7]; Dr. Ruiz Rep. 5; Ayala-Rubio Decl. ¶ 6.

Dr. Ayala-Rubio also submitted an exception from the BOP formulary policy to obtain gabapentin. Jeter Decl. Ex. 1 at 158; Ayala Rubio Decl. ¶ 7. Based on Dr. O'Brien's recommendation, Dr. Ayala-Rubio expedited the nonformulary request. Jeter Decl. Ex. 1, 158. The request was approved by FCI Sheridan's chief pharmacist that day and was subsequently approved by the Central Office Pharmacist and Dr. Grasley as the Medical Director the next day. *Id.*; Grasley Decl. ¶ 10. Plaintiff's first dose of gabapentin was administered three days later on April 4, 2022. Jeter Decl. Ex. 1, 141; Ex. 9 at 1. Additionally, Dr. Ayala-Rubio ordered a front cuff pass for Plaintiff. Jeter Decl. Ex. 3, Stratton Dep. 91:22–92:1; Jeter Decl. Ex. 1 at 183-185; Ayala-Rubio Decl. ¶ 8.

Also on March 31, 2022, Dr. Ayala-Rubio assisted Plaintiff with filling out a second release authorization for Plaintiff's Montana cancer treatment records. Jeter Decl. Ex. 1, 150.

On April 16, 2022, Plaintiff complained to Nurse Pond that he was threatened after being "moved into a sex offender cell."[8] Jeter Decl. Ex. 1, 150. His

---

[7] Gabapentin and morphine are not self-carry medications and must be administered in the pill line by staff. Each field on the Medication Administration Record shows the exact time the medication was administered and the initials of the medical staff who administered them. Bergman Decl. ¶ 8.

[8] Plaintiff admitted that he was convicted of aggravated sexual assault of his minor niece. Jeter Decl. Ex. 1, 169; Ex. 3, Stratton Dep. 107:5–108:5; 193:11–16.

Page 11 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

request to be placed in administrative detention in the SHU for protective custody was granted. Jeter Decl. Ex. 1, 112, 159.

On May 12, 2022, FCI Sheridan received partial records from Dr. Linford's clinic. Jeter Decl. Ex. 1, 149.

### F.    *Second Appointment with Dr. Ayala-Rubio*

On June 8, 2022, Dr. Grasley requested the oncology consult status. Jeter Decl. Ex. 1 at 186-187. The next day Dr. Ayala-Rubio met with Plaintiff again. Jeter Decl. Ex. 1, 110-111; Ex. 9 at 1-2. In response to Plaintiff's pain complaints, Dr. Ayala-Rubio doubled Plaintiff's gabapentin prescription. *Id.*; Ayala-Rubio Decl. ¶ 10. He also prescribed fluoxetine and mirtazapine for depression and anxiety. *Id.* That same day, Dr. Ayala-Rubio emailed administrative staff to inquire about when Plaintiff's oncology consultation would be. Jeter Decl. Ex. 1, 186-187. The following day staff informed the doctors that the second consultation was scheduled for August 17, 2022. *Id.*

On August 2, 2022, Plaintiff was involved in a use-of-force incident where he was placed on the ground after refusing orders to submit to a pat search and made an aggressive move toward BOP officers. *See infra* Part V. Plaintiff had a video-recorded medical evaluation by Nurse Mariana Zaragoza who determined that he suffered no injuries requiring medical treatment. *Id.*

### G.    *Second Appointment with Outside Oncology Provider*

On August 17, 2022, Plaintiff was seen at Dr. O'Brien's office by Jeffrey Schwab, NP, for a second consultation. Jeter Decl. Ex. 1, 144-148. Labs were drawn

Page 12 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

indicating that Plaintiff's multiple myeloma remained in remission. *Id.*; Dr. Rezvani Rep. 6. NP Schwab wrote: "When he was seen by Dr. O'Brien in March, there was discussion about an all-oral regimen for maintenance. We discussed that again today, but patient will be leaving for Montana in about 6 weeks. He will contact his oncologist upon return. . . . Will not schedule a return visit to our clinic since he will be in Montana on October 4." *Id.* Subsequently, Plaintiff was released from FCI Sheridan on October 4, 2022, and returned to Montana. Jeter Decl. Ex. 3, Stratton Dep. 130:6–16.

### III.    Medical Treatment after Release

#### A.    *From October 2022 through June 2023, Plaintiff Refused to Engage in Cancer Treatment*

After Plaintiff's release from FCI Sheridan, he refused to continue his cancer treatment and avoided his oncologist despite the advice of multiple medical providers. *See* Dr. Rezvani Rep. 6–8; Dr. Ruiz Rep. 7–8; Jeter Decl. Ex. 1, 72-73, 100-103. Prior to meeting with his oncologist, Plaintiff reported to different medical providers to obtain gabapentin and oxycodone. Jeter Decl. Ex. 1 at 73-74, 103-107; Stratton Dep. 134:9–135:5.

On October 31, 2022, when Plaintiff returned to Dr. Linford from the first time since his incarceration, Dr. Linford ordered myeloma blood work and a PET scan to restage Plaintiff's cancer treatment, a necessary first step before prescribing additional chemotherapy. *See* Dr. Rezvani Rep. 6–7; Jeter Decl. Ex. 1 at 39-41. Dr. Linford noted:

Page 13 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

> He asked why he is not re-starting therapy today and I informed him that he needs re-staging scans and labs and then we can determine the next step in care. He has declined vital signs and exam. At the end of our visit he acknowledge the need for labs and imaging. He then asked to have his old narcotic prescriptions refilled. I told him that I would not be refilling his narcotic prescription. I then left the room to order the labs and imaging and Mr. Stratton left without informing the clinic staff.

Jeter Decl. Ex. 1, 40. Dr. Linford also noted that Plaintiff left no up-to-day contact information for the clinic to reach him through to encourage scheduling labs, imaging, and a follow-up appointment. *Id.* at 41. Medical staff wrote: "Patient was to have labs drawn today and scheduled for PET/CT but walked out before I could do either. He didn't say anything, just walked out." Jeter Decl. Ex. 1, 39.

The next day Plaintiff went to his primary care physician Dr. Jones, told him he wanted a different oncologist, and asked for an oxycodone refill. Jeter Decl. Ex. 1 at 96-99. Dr. Jones wrote: "Patient again asking for refill of oxycodone today as that helps with pain but given that I am not sure what we [are] trick-or-treating at this point I do not feel comfortable prescribing." *Id.* at 98.

From November 2022 to June 2023, Plaintiff repeatedly sought overlapping pain medication prescriptions from different medical providers and avoided cancer treatment. *See* Dr. Rezvani Rep. 7–8; Dr. Ruiz Rep. 7–8; Jeter Decl. Ex. 1, 88-95 (noting Plaintiff needed a single provider prescribing narcotics and Plaintiff had not seen Dr. Linford); 108–09 (noting that Plaintiff "has a history of multiple myeloma and is noncompliant with his treatment"); 46-47, 71 ("[R]isk factors include multiple myeloma which he has been noncompliant with treatment. He did fire his

Page 14 –     **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

oncologist, Dr. Linford and new recommendation was to see Dr. Thomas, but he has not followed up with his recommendation."); 84-87 (noting that Plaintiff stopped chemotherapy "because he needed a break" and discussing the importance of seeing Dr. Linford); 30 (noting that Plaintiff "has not followed up as directed"); 81-83 (noting continued non-engagement with oncology and heavy alcohol use); 65-70 (refusing CT scan and other recommendations and noting "he has been noncompliant with recommended oncology and primary care follow up"); 64 (noting "all future narcotics has to come from a pain contract and a primary care provider" as opposed to the emergency department and reminding Plaintiff of the importance of calling Dr. Linford); 62-63 (noting Plaintiff claims he cannot engage with Dr. Linford, has "some phobia," and has been admitted for alcohol-induced pancreatitis).

On June 7, 2023, Plaintiff met with Dr. April Weinberger who noted that Plaintiff "was previously seen by Dr. Linford for his multiple myeloma, but stopped chemotherapy about 1-1/2 years ago because he felt like he needed a break. He has been reticent to return." Jeter Decl. Ex. 1, 78-80. Regarding Plaintiff's refusal to seek oncologic care, she wrote "he was not treating his multiple myeloma and I am not really interested in treating him if he is not seeking medical care." *Id.*

### B. *On June 15, 2023, Plaintiff Reengaged with His Oncologist for the First Time Since October 2022*

On June 15, 2023, Plaintiff returned to see Dr. Linford. Jeter Decl. Ex. 1, 196-198. Dr. Linford documented in the medical record: "Of note, the patient elopes from oncology appointments regularly, and has not made follow up in the past." *Id.*

Page 15 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

He also noted Plaintiff's "noncompliance of oncology treatment plan" and that Plaintiff "left without completing his visit today." Jeter Decl. Ex. 1, 197-198. No PET scan was scheduled to restage Plaintiff's chemotherapy treatment. Jeter Decl. Ex. 1, 53-57, 75-77.

On June 19, 2023, Plaintiff suffered a fracture of his right femur when he tripped. Jeter Decl. Ex. 1, 195, 199-200. This was the first evidence of myeloma progression following completion of induction therapy in November 2021. *See* Dr. Rezvani Rep. 8.

After surgery, Plaintiff continued his pattern of seeking pain medication from the emergency department despite his pain contract to only receive narcotics from one provider. *See* Jeter Decl. Ex. 1, 48-49, 58-61. On August 1, 2023, Plaintiff was seen by Dr. Weinberger at the emergency department and she wrote: "At this point I do not know what else to do to help this patient . . . I see no emergent issue he is already on oxycodone for pain control and I cannot prescribe him anything different than that." Jeter Decl. Ex. 1, 50-52.

On September 19, 2023, nearly a year after Plaintiff's release from FCI Sheridan, his chemotherapy treatment was reinitiated. Jeter Decl. Ex. 1, 194.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings and evidence show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating no genuine dispute of material fact exists.

Page 16 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet this burden, the moving party may point to the absence of evidence proffered by the non-moving party. *Id.* at 322.

To avoid summary judgment, the non-moving party must produce significant probative evidence showing a genuine issue of material fact exists. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). "[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).

**ARGUMENT**

## IV.    BOP Medical Providers Exceeded the Standard of Care and There is No Evidence of Causation

Drs. Grasley and Ayala-Rubio provided Plaintiff with excellent care, and they were responsive to his medical needs. Plaintiff's claims that that the doctors failed to treat his myeloma and his pain cannot survive summary judgment. Drs. Grasley and Ayala-Rubio are primary care physicians. The standard of care for such physicians was to refer Plaintiff to an oncology specialist and provide him with pain medications—which they did. The lack of a primary care physician's expert report from Plaintiff alone is sufficient to warrant summary judgment in the government's favor. BOP physicians are not trained to prescribe or monitor such treatment. The outside oncologist's decision to wait to reinitiate maintenance therapy until after Plaintiff's release cannot be attributed to BOP physicians who were required to defer to and follow the oncologist's recommendations. Further, contrary to the Amended Complaint, the record establishes that the doctors provided Plaintiff with

Page 17 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

a comprehensive regimen of pain medications including gabapentin and morphine that the oncologist recommended.

Second, even assuming the standard of care was breached, there is no evidence that BOP physician's actions caused Plaintiff harm. Causation must also be established by expert testimony that Plaintiff does not provide. His multiple myeloma remained in remission during the entirety of his incarceration. Had Plaintiff adhered to Dr. Linford's recommendations in October 2022, he could have resumed anti-myeloma therapy with no adverse effects on his condition and no negative impact on his health or life expectancy. There is no evidence in the record to support the conclusion that the absence of maintenance treatment during Plaintiff's incarceration impacted him. If anything, even in the light most favorable to Plaintiff, the only reasonable inference to draw from his well-documented avoidance of cancer treatment and drug-seeking behavior post-release is that those actions led to his myeloma coming out of remission by June 2023.

### A.    *Plaintiff Did Not Produce Expert Testimony Required to Establish the Standard of Care for Primary Care Physicians and the BOP Doctors Met or Exceeded the Applicable Standard*

Doctors Grasley and Ayala-Rubio met the standard of care for primary care physicians by referring Plaintiff to an oncologist and by providing a comprehensive regimen of pain medications. Oregon law requires proof of four elements in medical negligence cases: (1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) resulting harm to the plaintiff measurable in damages; and (4) a causal link between the breach and the harm. *Zehr v. Haugen*, 871 P.2d 1006,

Page 18 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

1010 (1994). The "duty" owed by a medical professional to a patient is to exercise "that degree of care, knowledge and skill ordinarily possessed and exercised by the average provider of that type of medical service." *Curtis v. MRI Imaging Servs. II*, 956 P.2d 960, 962–63 (1988); *See* Or. Rev. Stat. ("O.R.S.") § 677.095(1) (requiring physicians "to use that degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community of the physician or a similar community.").

Under Oregon law, Plaintiff must prove the standard of care through expert evidence. *Trees v. Ordonez*, 311 P.3d 848, 854 (2013); *see also Getchell v. Mansfield*, 489 P.2d 953, 955 (1971) (reasoning that "expert testimony is required to establish what the reasonable practices is in the community" because the standard of care for professional conduct is "ordinarily not within the knowledge of the usual jury"). The "general rule" is "that a practitioner is entitled to have his treatment of his patient tested by the rules and principles of the school to which he belongs." *Sheppard v. Firth*, 215 Or. 268, 271, 334 P.2d 190, 192 (1959); *see also Wemmett v. Mount*, 134 Or. 305, 313 (1930) (explaining that a physician should not be judged by the rules and principles of "some other school" of medicine).

### i.    *Plaintiff Did Not Provide Expert Testimony Establishing the Applicable Standard of Care*

Plaintiff's single-page report from oncologist Dr. Amit Garg, MD, concluding that the standard of care in that field is continuous chemotherapy is irrelevant to establishing the standard of care applicable to Drs. Grasley and Ayala-Rubio. *See* Jeter Decl. Ex. 17. The applicable standard of care can only be established by expert

Page 19 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

witness testimony. *See Getchell*, 260 Or. at 179. Tellingly, Dr. Garg's report does not mention Drs. Grasley or Ayala-Rubio nor does it attribute any breach in the standard of care to them. *Id.* This is because, as Dr. Rezvani states, the BOP physicians "are primary care physicians without specialized training in oncology." Dr. Rezvani Rep. 9.

The government's medical experts identified Plaintiff's lack of expert opinion establishing the applicable standard of care and, despite having the opportunity to provide rebuttal reports, Plaintiff provided none. *See* Jeter Decl. Ex. 12, Dr. Rezvani's Rebuttal Report ("Dr. Rezvani Rebuttal Rep.") 3; Ex. 14, Dr. Ruiz's Rebuttal Report ("Dr. Ruiz Rebuttal Rep.").

As Dr. Rezvani explained:

> The treatment of multiple myeloma is complex, involves potent and potentially dangerous chemotherapeutic drugs, and must be administered and monitored by a trained oncologist. Primary care physicians are not trained or qualified to treat multiple myeloma. It would have been inappropriate for Drs. Grasley or Ayala-Rubio to directly treat Mr. Stratton's myeloma, just as it would be inappropriate for them to personally perform cardiac surgery in a patient whom they diagnosed with a heart defect. Instead, their responsibility was to refer him promptly to a qualified specialist, which they did.

Dr. Rezvani Rep. 9–10. Additionally, the appropriate oral chemotherapy drug here, lenalidomide (Revlimid), is subject to FDA restrictions requiring specialized education and certification that oncologists typically complete. *Id.* Dr. Rezvani opined: "In my experience, it would be unheard-of, and medically inappropriate, for a primary care physician to be REMS-certified to prescribe lenalidomide, as the potential toxicities are severe enough that specialized oncologic expertise is required

Page 20 –   **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

to safely prescribe it." *Id.* at 10. "Thus, not only was the prescription of lenalidomide maintenance the medical responsibility of an oncologist rather than primary care physicians, but it would have been statutorily impossible for Drs. Grasley and Ayala-Rubio to prescribe this drug[.]" *Id.* at 10–12. In sum, "Drs. Grasley and Ayala-Rubio, as primary care physicians, are not trained to prescribe or monitor chemotherapy for multiple myeloma, and cannot be faulted for not doing so." *Id.* at 12.

Additionally, the second component of Plaintiff's medical malpractice claim is that BOP physicians inadequately treated his pain. *See* Am. Compl. ¶ 39(b). Plaintiff provides no expert testimony regarding the standard of care applicable to BOP's treatment of Plaintiff's pain.  Defendants, by contrast, provided expert reports establishing the standard of care opining that BOP physicians' treatment of Plaintiff's pain met or exceeded the standard. *See* Dr. Ruiz Rep. 8–10; Dr. Rezvani Rep. 10.

Thus, Dr. Garg's scant report that does not establish the applicable standard of care is insufficient to carry Plaintiff's medical malpractice claim past summary judgment and to trial.[9]

///

///

---

[9] To the extent Plaintiff's claims arise from the alleged lack of medical treatment of a purported rib injury resulting from the use-of-force incident, the lack of expert medical testimony from Plaintiff requires summary judgment in the United States' favor. *See* Am. Compl. ¶ 20; Dr. Ruiz Rep. 9.

Page 21 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

### ii.    Drs. Grasley and Ayala-Rubio Met or Exceeded the Standard of Care for Primary Care Physicians

The applicable standard of care for primary care physicians treating a patient with multiple myeloma is to refer that patient to an oncologist and provide pain management. Dr. Ruiz Rep. 8–11; Dr. Rezvani Rep. 9–10. There can be no genuine factual dispute that Drs. Grasley and Ayala-Rubio did both.

When Plaintiff arrived at FCI Sheridan he brought with him no record of his myeloma and no prescriptions related to his condition. *See supra* Part II.A. Plaintiff chose not to inform his oncologist Dr. Linford of his incarceration either. *Id.* When he requested to be seen by a BOP doctor to discuss his condition, an appointment was promptly scheduled. *Id.*

On February 15, 2022, he met with Dr. Grasley for the first time. *Id.* Dr. Grasley immediately prescribed oxcarbazepine, the equivalent of gabapentin. *Id.* He also scheduled a consult with an outside oncologist, ordered labs, and had Plaintiff fill out an authorization for release of medical records from Dr. Linford. *Id.* Dr. Grasley took the extra step of emailing staff that Plaintiff needed to be seen by an oncologist and have labs drawn "ASAP." *Id.* A few weeks later, on March 2, 2022, Dr. Grasley saw Plaintiff again, and Plaintiff refused all pain medications Dr. Grasley offered. *See supra* Part II.C. Plaintiff wanted gabapentin, but that was outside the BOP formulary and required trying formulary medications first. *Id.* Dr. Grasley also discussed Plaintiff's upcoming oncology appointment with him. *Id.*

On March 4, 2022, Plaintiff was seen by outside oncologist Dr. O'Brien. *See supra* Part II.D. She also had no information about Plaintiff's condition other than

Page 22 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

what he told her, and she could not prescribe any cancer treatment for him without his history and additional blood work. *Id.* She recommended gabapentin and morphine for pain, and ordered labs. *Id.* She also noted that after she received lab results, she would follow up with Dr. Grasley to see what was possible. *Id.* The labs showed that Plaintiff's myeloma remained in remission and she did not reach back out to Dr. Grasley. *Id.* Dr. Grasley, on his own initiative, sent himself two reminders in March to check on the status of the oncology consult and, on March 28, he requested a second consult with the outside oncologist. *See supra* Part II.D.

Two days later, Dr. Ayala Rubio met with Plaintiff for the first time and immediately took several actions that met or exceeded the standard of care. He also checked on the status of the oncology consult. *See supra* Part II.E. He ordered the morphine Dr. O'Brien recommended and put in a special non-formulary request for gabapentin that he expedited for approval. *Id.* Morphine was administered that same day and gabapentin a few days later. *Id.* Dr. Ayala-Rubio also had Plaintiff fill out a second request for Dr. Linford's records and he issued Plaintiff a front-cuff pass. *Id.* On June 9, 2022, when Plaintiff complained of pain, Dr. Ayala-Rubio doubled the dosage of his gabapentin and followed up about the status of a second oncology consult. *Id.* On August 17, 2022, the second outside oncology consult occurred. *See supra* Part II.F. Dr. O'Brien's office did not prescribe any chemotherapy treatment and noted that Plaintiff should resume treatment with Dr. Linford upon his upcoming return to Montana. *Id.* Labs drawn at that time showed that Plaintiff's myeloma remained in remission.

Page 23 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

Here, Dr. Grasley's prompt referrals to an oncologist met the standard of care. *See* Dr. Rezvani Rep. 9; Ruiz Rep. 9–11. As primary care providers, Drs. Grasley and Ayala-Rubio were not qualified to prescribe or administer cancer treatment and could only follow Dr. O'Brien's recommendations regarding Plaintiff's myeloma treatment. *Id.* The BOP physicians could not be faulted for not prescribing medications requiring specialized education and training they lacked. *See* Dr. Rezvani Rep. 9–10.

Likewise, Drs. Grasley and Ayala-Rubio's treatment of Plaintiff's pain met the standard of care. *See* Dr. Ruiz Rep. 8–10; Dr. Rezvani Rep. 10. Dr Grasley prescribed oxcarbazepine as a gabapentin alternative and recommended amitriptyline that Plaintiff refused. *See supra* Part II.B–C. Dr. Ayala-Rubio prescribed the gabapentin and morphine Dr. O'Brien recommended and doubled Plaintiff's gabapentin dose in response to his pain complaints. Both Drs. Ruiz and Rezvani opined that these actions met or exceeded the standard of care to make appropriate pain medication prescriptions. *See* Dr. Rezvani Rep. 10; Dr. Ruiz Rep. 8–11.

Accordingly, Plaintiff cannot show that BOP medical providers breached the applicable standard of care, and the United States is entitled to summary judgment.

### B.    *Plaintiff Cannot Establish Causation*

In addition to the requirement that Plaintiff prove his claim that the providers failed to meet the standard of care, he is also required to prove that the alleged failure caused his harm. *See Joshi v. Providence Health Sys. of Oregon*

Page 24 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

*Corp.*, 342 Or. 152, 160–62 (2006) (explaining the "but-for" causation standard); *Chapman v. Mayfield*, 358 Or. 196, 205 (2015); *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329, 340 (2004) ("A Plaintiff of course, must still prove 'factual' or 'but-for' causation — that there is a causal link between the defendant's conduct and the plaintiff's harm[.]"). Factual causation requires that the evidence must establish, to a reasonable medical probability, that the negligent conduct caused the patient's harm; the "mere possibility" of causation is insufficient. *Joshi*, 342 Or. at 164; *see also Sims v. Dixon*, 224 Or. 45, 48 (1960) ("The rule of reasonable probability also applies to expert witnesses.").

Expert testimony is required to establish medical causation. *Chouinard v. Health Ventures*, 179 Or. App. 507, 512 (2002). "When the element of causation involves a complex medical question, as a matter of law no fact finder can find that a plaintiff has established causation unless the plaintiff has presented expert testimony that it is a reasonable medical probability that the alleged negligence caused the plaintiff's injuries." *Baughman v. Pina*, 200 Or. App. 15, 18 (2005).

"As a general principle, maintenance therapy is effective as long as it is initiated before myeloma progression. *It may be started at any time prior to myeloma progression and the patient will still receive its benefit*." Dr. Rezvani Rep. 3 (emphasis added).

Here, Plaintiff's multiple myeloma remained in remission throughout his incarceration and his condition worsened only after his release when he refused to engage in cancer treatment. *See supra* Part III. In November 2021, Dr. Linford

Page 25 –   **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

informed Plaintiff that his myeloma was in remission and recommended transitioning him to maintenance treatment. *See supra* Part I. Plaintiff's myeloma remained in remission as of August 17, 2022, based on labs obtained by Oregon Oncology Specialists on that date. *Id.*; *see also* Dr. Rezvani Rep. 11. Dr. Rezvani opined that "to a reasonable degree of medical certainty, that Mr. Stratton's myeloma continued to remain in remission as of 31 October 2022, when he saw Dr. Linford after prison discharge." Dr. Rezvani Rep. 11. Dr. Rezvani elaborated: "Myeloma recurrences tend to occur slowly, especially early in the disease course, and it would be highly unusual and improbable to go from a documented complete remission to frank relapse within 2 months." *Id.*

At that October 31, 2022, appointment with Dr. Linford, restaging tests (blood work and PET scan) were required to resume chemotherapy treatment. *Id.* When Dr. Linford declined Plaintiff's demand for opioids, Plaintiff walked out without completing the tests and scheduling a return visit to resume myeloma treatment. *Id.* Had Plaintiff resumed treatment after his release from FCI Sheridan per Dr. Linford's recommendations, he would have received the full benefit of maintenance therapy. *See* Dr. Rezvani Rep. 11. From October 2022 through June 2023, Plaintiff continued his pattern of avoiding cancer treatment. *Id.* He did not resume chemotherapy until September 2023, nearly a year after his release from FCI Sheridan. *Id.*; *see also supra* Part III.B.

Dr. Rezvani opined that "[a]s a result of Mr. Stratton's refusal to complete the recommended testing on 31 October 2022, and his subsequent repeated failure

Page 26 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

to follow up with Dr. Linford in a timely fashion, he did not resume anti-myeloma therapy until after his remission ended and his myeloma relapsed." Dr. Rezvani Rep. 11. Dr. Rezvani concluded that had Plaintiff adhered to Dr. Linford's recommendations in October 2022, or subsequent medical recommendations given by the many physicians Plaintiff encountered, "he could have resumed maintenance therapy before his myeloma relapsed and thus have derived its full benefit." *Id.* Had Plaintiff done so, his "progression could have been delayed or prevented." *Id.* Dr. Rezvani concluded that Plaintiff's decision to refuse the care recommended by Dr. Linford and other physicians led to early progression of his multiple myeloma. "The care provided by Drs. Grasley and Ayala-Rubio during Mr. Stratton's incarceration played no role in the time to progression of Mr. Stratton's myeloma." *Id.* at 11–12.

Dr. Garg's report, however, entirely ignores that Plaintiff's myeloma remained in remission during his incarceration and impliedly attributes progression that occurred after Plaintiff's release from FCI Sheridan to BOP providers. *See* Jeter Decl. Ex. 17, Dr. Amit Garg's Report ("Dr. Garg Rep."). This report is insufficient to establish as a matter of law that BOP providers were responsible for administering maintenance treatment during Plaintiff's incarceration let alone that the absence of such treatment caused Plaintiff's injuries. The absence of any documentary evidence or expert testimony showing that Plaintiff's myeloma remission relapsed during his incarceration entitled the United States to summary judgment on causation.

Page 27 –     **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

Dr. Garg also claim that Plaintiff's anemia noted during his hospitalization in January 2023 for alcohol-induced pancreatitis was the first sign of myeloma progression after Plaintiff's incarceration. *See* Dr. Garg Rep.  There is no explanation for this opinion, nor does Dr. Garg specify the probability that Plaintiff's myeloma caused his worsening anemia as compared with the comorbidities for which he was hospitalized. *See* Dr. Rezvani Rebuttal Rep. 2. Dr. Rezvani explained that "[w]hile myeloma progression can cause anemia, other causes include alcohol abuse and active inflammatory processes such as acute pancreatitis." Dr. Rezvani Rebuttal Rep. 2. He concluded that "to a reasonable degree of medical certainty, Mr. Stratton's anemia in the setting of acute alcoholic pancreatitis was driven primarily by inflammation and alcohol abuse, and is not convincing evidence of progressive myeloma." *Id.* Further, Plaintiff had mild anemia while his myeloma was in remission as evidenced by blood work obtained on March 4, 2022, by Dr. O'Brien. *Id.* Later blood work on August 17, 2022, through Dr. O'Brien showed anemia as well during myeloma remission. In other words, Plaintiff's "anemia was present while his myeloma was in remission, independent of myeloma activity, and was no worse (in fact, less severe than baseline) in 1/2023 at his presentation with alcoholic pancreatitis." *Id.* Dr. Rezvani concluded that those trends, "[t]aken together" show that the anemia in January 2023 "was not related to myeloma progression." *Id.*

More broadly, even if the anemia in January 2023 was accepted as an indication of myeloma progression, this occurred more than three months after

Page 28 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

Plaintiff's release from prison and after he had the opportunity to resume maintenance therapy through Dr. Linford. *Id*. Dr. Rezvani opined that "while I disagree that the anemia seen in 1/2023 is evidence of myeloma progression, that point would still not affect the conclusion that Mr. Stratton had opportunity to resume maintenance therapy before myeloma progression." *Id*. Had he done so, Plaintiff "would have received the full benefit of maintenance therapy regardless of whether progression is deemed to have occurred in" January versus June 2023. *Id*. Put another way, had Plaintiff restarted maintenance treatment while his myeloma was in remission—which it was after his release from FCI Sheridan—then he would have received the full benefit of that treatment.[10]

Thus, Plaintiff cannot establish causation, and the United States is entitled to summary judgment on Plaintiff's FTCA medical malpractice claim.

## V.    BOP Officers Applied the Appropriate Amount of Force in Response to Plaintiff's Display of Imminent Violence and Active Resistance

In August 2022, during a mass search for contraband, Plaintiff refused officers' orders to submit to a pat search, actively resisted the officers, and made an

---

[10] Dr. Garg also appears to opine that Plaintiff's life expectancy and progression free survival were affected by an undefined gap in maintenance therapy. *See* Dr. Garg Rep. (¶¶ 6, 8–9). Plaintiff provides no probability regarding this "loss of chance theory," cites nothing in the medical record supporting this opinion, and relies on an outdated study involving treatment substantially different from what Plaintiff received. *See* Dr. Rezvani Rebuttal Rep. 3–4; Stratton Dep. 172:5–7 (admitting he never received a personal life expectancy estimate from Dr. Linford). In any event Plaintiff did not "plead the percentage and quality of his . . . loss of chance, which in turn must be based on the plaintiff's experts and relevant scientific evidence that meets the standard of reasonable medical probability." *Smith v. Providence*, 361 Or. 456, 483 (2017).

Page 29 –     **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

aggressive move toward Officer Pickard who was holding him. In response, the officers used objectively reasonable force to place him on the ground and hold him there until leg restraints could be applied. The battery allegations in Plaintiff's Amended Complaint are incredible and lack any factual support. *See* Am. Compl. ¶ 20. The incident was video recorded from two angles and witnessed by several officers. The officers' use of force was justified and there are no facts from which a reasonable factfinder could find that the force used was unreasonable.

### A.      *Use of Force Incident*

On August 2, 2022, at approximately, 9:55am, BOP officers were conducting a mass search of the SHU for contraband. *See* Jeter Decl. Ex. 15, Report of Cpt. Jeremy Hess ("Hess Rep.") 2; Declaration of Brent Pickard ("Pickard Decl.") ¶ 5; Jeter Decl. Ex. 1, 160. The officers were going door-to-door in the SHU from one end of the range to the other, applying wrist restraints to the inmates through the doors' cuff ports, and having the rooms' occupants enter the hallway. Pickard Decl. ¶ 5. Then inmates were required to face the wall and submit to a pat. *Id.* Then the inmates were then to be escorted to a secure area while BOP officers searched their rooms for contraband. *Id.*

When the BOP officers reached Plaintiff's room, BOP officers handcuffed Plaintiff's hands in front of him through the door's cuff port. Jeter Decl. Ex. 5, Deposition of Brent Pickard ("Pickard Dep.") 15:6–16:3. Plaintiff was instructed to submit to a pat search. *See* Hess Rep. 2; Pickard Decl. ¶ 6, Jeter Decl. Ex. 10, 1-2;

Page 30 –     **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

Ex. 1, 160. Plaintiff yelled "fuck you!" three to four times in response to Officer

Pickard's orders. Pickard Dep. 14:12–15:5; Ex. 1, 160.

Officer Pickard removed Plaintiff from his cell and stood him facing against

the opened door in the hallway. Jeter Decl. Ex. 18 at 00:40–00:45; Pickard Decl. ¶ 7.

Plaintiff was required to remain facing toward the door and submit to the search.

Plaintiff testified, "I knew the drill. I knew what I was supposed to do." Stratton

Dep. 112:22–113:3. Officer Pickard gave Plaintiff multiple orders to keep his head

forward, not to move, and submit to the pat search. Jeter Decl. Ex. 1, 160; Ex. 10, 1-

2; Pickard Dep. 16:17–24. Plaintiff continued his resistance to Officer Pickard's

orders. Officer Pickard attempted to deescalate by holding Plaintiff in place and

repeating his commands. *See* Hess Rep. 3; Jeter Decl. Ex. 10, 3-4; Ex. 1, 160.

Officer Pickard had his left hand holding Plaintiff's upper-left arm and his

right hand on Plaintiff's right shoulder. Pickard Decl. ¶ 6. Plaintiff attempted to

pull out of Officer Pickard's grip and turn toward him in an aggressive manner with

his fists balled up in front of him. *See* Hess Rep. 3; Jeter Decl. Ex. 1, 160, Ex. 20 at

00:30–00:45 (upper left-hand corner); Pickard Dep. 20:23–21:15; Pickard Decl. ¶ 7.

In response to Plaintiff's active resistance and display of imminent violence, Officer

Pickard placed Plaintiff on the floor where he was restrained by staff. Jeter Decl.

Ex. 18 at 00:45–56, Ex. 10, 3-4; Pickard Dep. 29:15–30:7; Pickard Decl. ¶¶ 8–11.

Nearby officers immediately responded by securing Plaintiff's unsecured

appendages with their hands. Jeter Decl. Ex. 18 at 01:02–01:31; Pickard Decl. ¶ 12.

The officers held Plaintiff for approximately 30 seconds while he continued

Page 31 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY
             JUDGMENT**

physically resisting on the floor before control of the inmate was achieved. *Id.*; *See also* Hess Rebuttal Rep. 2.  At that point, leg restraints had been retrieved and were applied to Plaintiff. Jeter Decl. Ex. 18 at 03:20–3:40.

He was then escorted by officers to a dry cell where he was photographed. Pickard Dep. 34:4–7. The photographs depict minor bleeding on his right wrist and some redness on his upper forehead. Jeter Decl. Ex. 1, 161-164. Officers then escorted him to another room where a video-recorded medical examination by Nurse Zaragoza was conducted. Jeter Decl. Ex. 19; Ex. 1 at 165-168. At that point the minor laceration had resolved, and the only injury Plaintiff claimed he had was tenderness to his right ribs. *Id.* Nurse Zaragoza evaluated Plaintiff and found no indication of injury requiring medical treatment. Jeter Decl. Ex. 1, 167; Ex. 19 at 06:50–07:09; *see also* Ruiz Rep. 6.

### B.      BOP Officers' Use of Force Was Objectively Reasonable

Under Oregon law, a "battery" is a "voluntary act that is intended to cause the resulting harmful or offensive contact." *Walthers v. Gossett*, 148 Or. App. 548, 552 (1997); *Ballard v. City of Albany*, 221 Or. App. 630, 640–41 (2008). "Oregon law provides, however, that a law enforcement officer is justified in using physical force so long as the force used was not more than necessary under the circumstances to accomplish the officer's law enforcement duties." *Kristiansen v. United States*, No. 3:24-CV-01719-IM, 2025 WL 2049290, at *3 (D. Or. July 22, 2025) (citing *Gigler v. City of Klamath Falls*, 21 Or. App. 753, 763 (1975)); *see also* O.R.S. § 161.233. Only "the use of excessive force by a police officer . . . can give rise to civil liability for

Page 32 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

battery." *Ballard*, 221 Or. App. at 641. "This standard mirrors the 'objective reasonableness' standard that governs a federal civil rights claim premised on the use of excessive force by law enforcement officers." *Kristiansen*, 2025 WL 2049290, at *3 (citing *Price v. City of Sutherlin*, 945 F. Supp. 2d 1147, 1157 (D. Or. 2013)).

In a police excessive force case, the plaintiff bears the burden of proving the force used was unreasonable. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("Because [plaintiff] failed to meet her burden of proof of providing specific facts to show that the force used was unreasonable . . ., the district court did not err in granting summary judgment to the [defendants] on [plaintiff's] claim of unreasonable force.").

Significantly, police officers are not "required to use the least intrusive degree of force possible" as long as the force used was reasonable. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the "20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). And "[t]he calculus of reasonableness must embody the allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Generally, "[t]he fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable." *Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1170 (9th Cir.

Page 33 –     **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

1996), *overruled in part on other grounds by Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997).

In evaluating objective reasonableness under the totality of the circumstances, courts rely on the following *Graham* factors: (1) the severity of the conduct at issue: (2) whether the individual poses an immediate threat to the safety of officers or others; and (3) whether they are actively resisting arrest or attempting to evade arrest by fleeing. 490 U.S. at 396. "Whether the suspect posed an 'immediate threat to the safety of the officers or others' is the 'most important' of the *Graham* factors. *Reddye v. City of Astoria*, No. 3:22-CV-01569-AR, 2025 WL 1160044, at *6 (D. Or. Mar. 31, 2025*), report and recommendation adopted*, No. 3:22-CV-01569-AR, 2025 WL 1158114 (D. Or. Apr. 21, 2025) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005), *disapproved of by Lemos v. Cnty. of Sonoma*, 40 F.4th 1002 (9th Cir. 2022) (en banc)).

Here, BOP officers used objectively reasonable force to prevent injury to themselves, maintain prison safety and security, overcome Plaintiff's active resistance, and to carry out their lawful duty of conducting a mass search for contraband. *See* Jeter Decl. Ex. 10 at 3-4; Hess Rep. 3–8; Hess Rebuttal Rep. 1–4. BOP officers' actions aligned with BOP use-of-force policy[11] that incorporate the objective reasonableness standard. *See* Hess Rep. 3–8. BOP "Use of Force and Application of Restraints" policy authorizes staff to apply an immediate use of force

---

[11] Jeter Decl. Ex. 2 at 44-66; Jeter Decl. Ex. 2, at 38–41 (depicting the use-of-force continuum) [Program Statement 5566.07], available at https://www.bop.gov/policy/progstat/5566.07.pdf;

Page 34 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

to use force "necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff and others, . . . and to ensure institution security and good order." Hess Rep. 3–5. "Staff are authorized to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate: . . . Becomes violent or displays signs of imminent violence." *Id.*  Further, "[s]ituations when an appropriate amount of force may be warranted include, but are not limited to: (1) Defense and protection of self or others; (2) Enforcement of Institutional regulations; and (3) The prevention of crime or apprehension of one who has committed a crime." Hess Rep. 4.

When BOP officers arrived at Plaintiff's cell in the SHU, they were enforcing BOP contraband regulations. Hess Rep. 5–6. In response to Officer Pickard's commands to submit to a pat search by standing and facing the wall and not turning toward officers, Plaintiff yelled "Fuck you!" multiple times. *See supra* Part V.A; Jeter Decl. Ex. 10, 3-4; Hess Rep. 5; Hess Rebuttal Rep. 1. Plaintiff turned toward Officer Pickard during this verbal exchange. *See* Hess Rep. 5; Jeter Decl. Ex. 18 at 0:45-0:56; Ex. 20 at 0:39–40.

When faced with Plaintiff's initial resistance, Officer Pickard determined the appropriate response. To assist BOP staff with determining the appropriate use of force under policy, they are trained in the BOP's Use of Force Model and Continuum comprised of five color-coded progressive levels of enforcement electives. *See* Hess Rep. 6; Jeter Decl. Ex 2 at 38–41; Pickard Decl. ¶ 10. Each level has a corresponding reasonable officer response. Hess Rep. 6. Plaintiff's initial behavior qualified as

Page 35 –   **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

level 3 "active resistance" (Yellow). Hess Rep. 6. Such behavior includes physical defiance and greater resistance to commands. *Id.* The policy's written example of active resistance is: "An inmate pulls away from an employee during a pat search." *Id.*; Jeter Decl. Ex. 2 at 39.

In response, Officer Pickard employed level 2 and level 3 compliance techniques by holding Plaintiff against the wall and repeating his verbal commands to deescalate the situation. Hess Rep. 6.  Plaintiff's behavior escalated to level 4 Assaultive Bodily Harm (Orange), by turning to face Officer Pickard, attempting to pull out of the officer's grip, and making a sudden and aggressive move toward the officer. Hess Rep. 6. The fact Plaintiff's hands were front cuffed and clenched into fists heightened the safety risk he posed to Officer Pickard. Hess Rep. 6. At this point, Plaintiff was "displaying signs of imminent violence" under BOP policy, was actively resisting, struggling with Officer Pickard, and posing a threat to officer safety under *Graham* factors two and three. *See* Jeter Decl. Ex. 2 at 1; *Graham*, 490 U.S. at 396; *Price v. City of Sutherlin*, 945 F. Supp. 2d 1147, 1156 (D. Or. 2013) (contrasting passive resistance with "actively struggling with an officer attempting to perform his or her duties").

In response, Officer Pickard utilized level 3 compliance techniques and level 4 controlling/defensive tactics. Hess Rep. 7. Officer Pickard placed Plaintiff on the floor and other officers immediately secured Plaintiff's unsecured appendages. *Id.* This low-level of non-lethal force was justified to gain control of the inmate, overcome Plaintiff's active resistance, protect officer safety, and promote order. *Id.*;

Page 36 –   **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

*see also Jones v. North Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 127 (1977) (recognizing that maintaining prison safety and avoiding potential danger "are peculiarly within the province of professional expertise of corrections officials"); *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (recognizing that "protecting prison security" is "central to all other correctional goals").

The video evidence, written reports, witness testimony, Cpt. Hess's reports, and the medical record definitively establish that the officers' use of force was objectively reasonable and thus justified. Plaintiff's incredible claims that he was cuffed from behind, had his head slammed into the wall multiple times, was punched and kneed while on the ground, and had his genitals groped are belied by the videos and uncorroborated by any evidence in the record. *See* Am. Compl. ¶ 20. Accordingly, the officers' use of force was reasonable as a matter of law and the United States is entitled to summary judgment on Plaintiff's battery claim.

## VI.    Plaintiff's Rehabilitation Act Claim is Without Merit

Finally, summary judgment should be granted in the United States' favor on Plaintiff's Rehabilitation Act claim alleging that BOP failed to provide him crutches. *See* Am. Compl. ¶¶ 28–36. To state a claim under the Rehabilitation act, a Plaintiff must establish: "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007)

Page 37 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

(quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001)).

Plaintiff claims "Defendant knew that Plaintiff requested accommodations/aids, disregarded his requests without trying to determine if it was possible to accommodate his request, and failed to provide an adequate accommodation in lieu of crutches." Am. Compl. ¶ 34. Discovery has established that these allegations are false.

First, Plaintiff admits that he never submitted a written request to staff for crutches or any other mobility aid. Stratton Dep. 86:23–87:7. Had Plaintiff brought his Rehabilitation Act claim while he was still incarcerated, it would have been subject to dismissal for failure to exhaust by not submitting a written request to staff. *O'Guinn*, 502 F.3d at 1061–62. Rather than seek to obtain an accommodation while incarcerated—giving prison officials the first opportunity to address prison conditions as Congress intended—Plaintiff instead opted to wait until after his release and seek money damages for the lack of an accommodation. *Id.* at 1061–62 (citing *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002)). While the exhaustion requirement does not apply because Plaintiff is no longer a prisoner, the lack of a request for a reasonable accommodation here should be dispositive of his claim. *See e.g. Romero v. Cnty. of Santa Clara*, No. 11-CV-04812-WHO, 2014 WL 3378628, at *16–17 (N.D. Cal. July 10, 2014), *aff'd*, 666 F. App'x 609 (9th Cir. 2016) (recognizing that the plaintiff cannot blame the defendant for denying a reasonable accommodation he never requested).

Page 38 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

Further, discovery revealed no evidence supporting this claim. *See* Am. Compl. ¶ 34. The record shows that Plaintiff made other written requests to medical staff that were promptly responded to. *See supra* Part II.A–C, E–F. Plaintiff testified that he did not make any request to staff for crutches, written or verbal. *See* Stratton Dep. 86:23–87:7. The lack of any reasonable accommodation request is fatal to Plaintiff's claim.

Assuming Plaintiff's uncorroborated claim that he brought crutches to FCI Sheridan and that those crutches were taken away early in his incarceration was true,[12] the claim still fails. Stratton Dep. 85:18–86:17. When Plaintiff returned from his first oncology appointment on March 4, 2022, Paramedic Karl Bergman gave him express written authorization to obtain crutches should he wish to do so. Declaration of Karl Bergman ("Bergman Decl.") ¶¶ 6–7; Jeter Decl. Ex. 1 at 124-125, 142. Consistent with Mr. Bergman's practice, he gave Plaintiff multiple copies of this form that, in turn, could be given to BOP staff to obtain crutches. Bergman Decl. ¶¶ 6–7; Bergman Dep. 8:8–24. Simply put, BOP offered Plaintiff crutches, and he was not denied a reasonable accommodation. Had Plaintiff made a reasonable accommodation request for crutches or given the authorization to staff, he would have received them. Bergman Decl. ¶ 6-7. Accordingly, summary judgment should

---

[12] It is possible that crutches could have been confiscated when Plaintiff was admitted to suicide watch in the SHU, consistent with BOP policy regarding items allowed in a suicide watch cell. *See e.g.*, Jeter Decl. Ex. 1, 188 (listing the items Plaintiff was allowed during suicide watch). However, there is no record of Plaintiff's crutches, their alleged confiscation, nor any BOP witness testimony to corroborate his claim.

Page 39 –    **DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

be granted on Plaintiff's Rehabilitation Act Claim based the lack of any reasonable accommodation request, any denial thereof, and record demonstrating that BOP authorized Plaintiff to obtain crutches.

## CONCLUSION

Based on the foregoing, Defendant United States respectfully requests that summary judgment be granted in its favor on Counts II–IV of the Amended Complaint.

Respectfully submitted this 18th day of December, 2025.

SCOTT E. BRADFORD
United States Attorney
District of Oregon

*/s/ Michael J. Jeter*
MICHAEL J. JETER
Assistant U.S. Attorney
Attorneys for the Defendant United States

## WORD COUNT CERTIFICATE

The preceding memorandum complies with the applicable word-count limit under LR 7-2(b), because it contains 10,914 words, based on the word-count function of the word processing system used to prepare the memorandum. This word count includes headings, footnotes, and quotations, but excludes the caption, table of contents, table of authorities, signature block, and certificates of counsel.

Respectfully submitted this 18th day of December 2025.

SCOTT E. BRADFORD
United States Attorney
District of Oregon

*/s/ Michael J. Jeter*
MICHAEL J. JETER
Assistant United States Attorney
Counsel for Defendants